Frank J. Wright
C. Ashley Ellis
Gogi Malik
**WRIGHT GINSBERG BRUSILOW P.C.**
14755 Preston Road, Suite 600
Dallas, Texas 75254
(972) 788-1600
(972) 239-0138 - fax

**PROPOSED ATTORNEYS FOR DEBTORS**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| THE GARDENS OF GRAPEVINE | § | CASE NO.  11-43260-11 |
| DEVELOPMENT, L.P., | § | |
| | § | |
| THE GARDENS OF GRAPEVINE | § | CASE NO.  11-43261-11 |
| DEVELOPMENT GP, LLC, | § | |
| | § | |
| Debtors. | § | |

### DEBTOR'S MOTION PURSUANT TO SECTION 363 OF THE
### BANKRUPTCY CODE TO APPROVE THE SALE OF CERTAIN
### REAL PROPERTY TO LINCOLN PROPERTY COMPANY SOUTHWEST, INC.

**HEARING DATE ON SUCH SALE IS SET FOR JULY 5, 2011
AT 1:30 P.M., WHICH IS AT LEAST 24 DAYS FROM THE DATE OF
SERVICE HEREOF.  NO OBJECTION TO SUCH SALE WILL BE
CONSIDERED UNLESS A WRITTEN RESPONSE IS FILED WITH THE
CLERK OF THE UNITED STATES BANKRUPTCY COURT AT ELDON
B. MAHON U.S. COURTHOUSE, 501 W. TENTH STREET, ROOM 147,
FORT WORTH, TEXAS 76102-3643 AT LEAST 4 DAYS IN ADVANCE OF
SUCH HEARING DATE.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE
CLERK, A COPY SHALL BE SERVED UPON COUNSEL FOR THE
MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH
HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH
NOTICE ONLY TO THE OBJECTING PARTY.**

Tarrant County (the "Property"). GOG's general partner is The Gardens of Grapevine Development GP, LLC, also a debtor in these cases ("GOG - GP").

5.      The Property was originally planned and marketed as the World Villages of Grapevine. It was acquired in two tracts. The first tract of 142.122 acres was acquired in August 2007 from Hunt Building Corporation. The second tract of 50.556 acres was acquired in August 2007 from Robert Beall. A 20 acre tract was sold in February 2009 to PLL Bonsai Group, LP, thereby reducing the total acreage to 192 acres. GOG is still owed money from that transaction. The Property was proposed to be developed as an urban, mixed-use development with a mix of retail, dining, entertainment, office, residential and open space consisting of 21 separate tracts. The faltering economy however has interfered with the original plans for the Property, and the Property is currently being sold in different sized tracts for the highest and best use obtainable. The Property was appraised as having a fair market value of $53,250,000 on October 8, 2010.

6.      The Property is purportedly encumbered by liens to three financial institutions, property taxing authorities and certain mechanics liens. Branch Banking & Trust Company, successor in interest to Colonial Bank ("BB&T") asserts a first lien against the Property to secure two notes totaling approximately $19 million. Compass Bank and Amegy Bank NA ("Judgment Creditors") assert a joint second lien against the Property to secure judgments in favor of Compass Bank in the approximate amount of $5.5 million (amount owed after $1,860,000 payment) and in favor of Amegy Bank in the approximate amount of $2.5 million (amount owed after $1 million payment). Property taxing authorities assert liens against the Property to secure payment of $262,000 in taxes for 2010 and $248,000 for 2008 and 2009 as a result of a roll back of taxes resulting from the loss of the agricultural exemption on the Tarrant County portion of the Property

(the rollback amount was being paid under a payment plan). The Debtors are also aware that Phi Engineering Design & Consulting Corp. previously asserted a mechanic's lien against the Property in the amount of $51,201.00, but believe that this lien has been released.

7.      GOG engaged Parkway Realtors, Inc. ("PRI"), a local real estate broker, to market the Property for sale in October 2010. PRI has extensively marketed the Property to potential purchasers/investors since that time. As a result of their efforts, a contract was signed pre-petition with Lincoln Property Company Southwest, Inc. (the "Proposed Buyer") to purchase a portion of the Property.

## II. PROPOSED SALE

8.      Attached hereto as "Exhibit A" is that certain *Contract of Sale* ("Sale Agreement") by and between GOG and the Proposed Buyer. Pursuant to the Sale Agreement, GOG agrees to sell (the "Proposed Sale") to the Proposed Buyer 16.825 acres of the Property located in Grapevine, Tarrant County, Texas (the "Sale Property"). The Sale Agreement will govern the Proposed Sale, and all parties are encouraged to study the same. Nevertheless, the Debtors offer the following summary:

- o     the purchase price is approximately $6.9 million (the "Purchase Price" or the "Proceeds");[1]

- o     the Proposed Buyer has delivered an initial earnest money deposit of $25,000 in cash;

- o     if the Proposed Buyer does not terminate the Sale Agreement prior to the expiration of the Inspection Period (as defined in the Sale Agreement), the Proposed Buyer shall deliver an additional earnest money deposit of $50,000;

---

[1]   The purchase price to be paid shall be determined by multiplying the number of net square feet set forth in the survey of the Sale Property by $9.50.

- upon the zoning change required by the Proposed Buyer, the Proposed Buyer shall deliver an additional earnest money deposit of $100,000, for a total earnest money deposit of $175,000;

- the closing date will be no later than sixty (60) days from the later to occur of (i) the expiration of the Inspection Period and (ii) the expiration of the Zoning Period (the closing is estimated to occur within 4-6 months);

- upon closing, GOG will execute a special warranty deed conveying good and indefeasible fee simple title to the Sale Property, subject only to the Permitted Exceptions (as defined in the Sale Agreement);

- the Proposed Buyer will acquire an option for 24 months in which to purchase the adjacent 17 acres at a purchase price of $9.50 per net square foot; and

- GOG's real estate broker, PRI, who negotiated and brokered the Proposed Sale, will be entitled to a commission of six percent (6%).

9.      GOG and their representatives negotiated and executed the Sale Agreement in good faith, through arm's length negotiations, after significant marketing efforts. The Purchase Price is fair and adequate, and advantageous for GOG's estate, in light of the real property market conditions in the Dallas/Fort Worth area. Moreover, the sooner the Sale Property can be sold, the sooner GOG's estate can stop accruing property taxes and other potential liabilities on account thereof.

## III. DISCUSSION

### A.      SALE OF PROPERTY

10.      Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate ... ." 11 U.S.C. § 363(b)(1). Section 363(b), however, does not provide an express standard for determining whether the Court should approve any particular sale. Rather, similar to the business judgment standard for assumption of a contract, the "articulated business justification"

standard has been used by the courts for sales of assets outside the ordinary course.  This standard was first enunciated by the Second Circuit Court of Appeals:

> The history surrounding the enactment in 1978 of current Chapter 11 and the logic underlying it buttress our conclusion that there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b).

> The rule we adopt requires that a judge determining a section 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.[2]

11.    The Fifth Circuit specifically adopted the *Lionel* standard in *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986), stating:

> We also agree with the Second Circuit - that implicit in section 363(b) is the further requirement of justifying the proposed transaction.  *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983).  That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business ... .  Whether the proffered business justification is sufficient depends on the case.

12.    It has been generally determined and accepted that a sale out of the ordinary course of business pursuant to section 363(b)(1) of the Bankruptcy Code will be approved as in the best interests of the estate if the sale price is fair and reasonable and the sale is made in good faith.[3]  GOG believes that there is a sufficient business justification for entering into the Sale Agreement on the terms contained therein and consummating the Proposed Sale pursuant thereto, that the Purchase Price is fair and equitable and that the same was reached in good faith.

---

[2]  *In re Lionel Corp.*, 722 F.2d 1063, 1070-71 (2nd Cir. 1983)

[3]  *In re Apex Oil Co.*, 92 B.R. 847, 866 (Bankr. E.D. Mo. 1988) (citing cases); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987)

13.     Here, GOG and their representatives, including their professional real estate broker with extensive experience in the commercial real estate market, engaged in good faith and arm's length negotiations with the Proposed Buyer. The Purchase Price is the highest and best offered for the Sale Property. The Proposed Buyer is not an insider of the Debtors and is in no way a straw-man or otherwise affiliated with the Debtors' principals. Finally, selling the Sale Property will relieve GOG's estate of continuing obligations on account thereof.

14.     For all of these reasons, the Debtors submit that approval of the Proposed Sale is in the best interests of the Debtors' estates.

**B.     POTENTIAL INTERESTS IN THE SALE PROPERTY**

15.     As has been previously noted, GOG believes that there are two (2) significant liens on the Property which include the Sale Property. BB&T asserts a lien based on a first-priority deed of trust which secures approximately $19 million.   The Judgment Creditors assert a lien based on a second-priority deed of trust to secure judgments of approximately $5.5 million and $2.5 million.

16.     GOG is also aware that Phi Engineering Design & Consulting Corp. previously asserted a mechanic's lien against the Sale Property in the amount of $51,201.00, but believes that this lien has been released.

17.     Finally, the Tarrant County taxing authorities are secured by statutory liens on the entire Property to secure approximately $510,000 in taxes, a portion of which would be applicable to the Sale Property.

## C.   AUTHORITY TO SELL FREE AND CLEAR

18.   Section 363(f) of the Bankruptcy Code authorizes a debtor to sell property outside of the ordinary course of business "free and clear of any interest in such property of an entity other than the estate, only if -

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

11 U.S.C. § 363(f).

19.   Section 363(f) contains an "or," not an "and." Since the five conditions listed in 11 U.S.C. §363(f) are phrased in the disjunctive, the Debtors may sell property free and clear if any one of these five conditions is satisfied.[4]

*Application of § 363(f)(5)*

20.   Under section 363(f)(5), debtor may sell estate property free and clear of interests where the entity holding an interest in such property could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. Contractual provisions which fix the price or establish a formula for the satisfaction and release of a lien by the payment of money -

---

[4] *See Newport Acquisition Co. No. 1 L.L.C. v. Crossroads Capitals Partners L.L.C. (In re C-Power Prods. Inc.)*, 230 B.R. 800, 803 (Bankr. N.D. Tex. 1998); *see also Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002); *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 506 (Bankr. N.D.Ala. 2002); *Citicorp Homeowners Servs. Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988)

provisions that effectively monetize the value of the lienholder's interest - satisfy the requirement

of a legal or equitable proceeding in which the lienholder could be compelled to accept a money

satisfaction of such interest set forth in of § 363(f)(5).[5] "By its express terms, Section 363(f)(5)

permits lien extinguishment if the trustee can demonstrate the existence of another legal mechanism

by which a lien could be extinguished without full satisfaction of the secured debt."[6] "Section

363(f)(5) does not require that the sale price for the property must exceed the value of the interests,

but rather, only that the mechanism exists to address extinguishing the lien or interest without

paying such interest in full."[7]

21.    In this instance, in the event of a partial sale of the Property, the loan documents with

BB&T provide for a release of BB&T's lien on individual tracts or parcels of the Property provided

that BB&T receives the greater of (a) 90% of the net sale proceeds or (b) $5.55 multiplied by the

number of gross square feet of the parcel being sold.  This release price provision is a wholly

enforceable means by which BB&T could be compelled to accept a money satisfaction of its interest

---

[5]    *See, e.g., In re East Airport Development, LLC*, 443 B.R. 823, 830 (9th Cir. BAP 2011)(existence of release price provision satisfied §363(f)(5)); *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 43 (9th Cir. BAP 2008)(giving examples of contractual provisions that meet the requirement of §363(f)(5) including a buy-out arrangement in a partnership agreement or joint venture agreement, a liquidated damages clause in a contract or a damages in lieu of conveyance of real estate provision); *In re MMH Automotive Group, LLC*, 385 B.R. 347, 372 (Bankr. S.D.Fl. 2008)(where billboard lease contained express valuation of interest for purposes of buy out, interest-holder had contractually agreed to monetize the value of its interest, thus §363(f)(5) applied)

[6]    *In re Terrace Chalet Apts.*, 159 B.R. 821, 829 (N.D. Ill. 1993)

[7]    *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 508 (Bankr. N.D.Ala. 2002).  *See also Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25, 42-43 (9th Cir. BAP 2008)

---

in the Property.[8]  The release price provision was implicated and satisfied previously in a sale of a 20 acre parcel of the Property in 2009; that tract was sold, BB&T released its lien, and BB&T was paid, all pursuant to the release price provisions in the loan documents.  In fact BB&T agreed to accept less than required by the release provisions.

22.      With regard to the second liens asserted by the Judgment Creditors, the Judgment Creditors likewise could, via the Texas state judicial or non-judicial foreclosure laws, be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their interests, thereby satisfying §363(f)(5), and/or the Proposed Sale can be approved over the objection of the Judgment Creditors pursuant to §363(f)(1) because applicable bankruptcy law, again, the Texas state foreclosure laws, permit the sale of the Property free and clear of the Judgment Creditors' interests.[9]  Indeed, in the absence of this bankruptcy proceeding, that is precisely what would have happened given BB&T's posting of the Property for foreclosure.  Under the orderly Chapter 11 plan of reorganization and/or §363 sale process, the Judgment Creditors interests will be taken into account; under the Texas state laws, if BB&T had foreclosed, it is entirely likely that the Judgment Creditors' interests would have been wiped out completely.

---

[8]  *See In re East Airport Development, LLC*, 443 B.R. 823, 830 (9th Cir. BAP 2011)(Discussing §363(f)(5), the Court concluded that "the release price agreement in this case is a contractual mechanism under which [the lienholder] could be compelled, in a specific performance action, to accept money satisfaction of its interest for less than the full value of its claim.")

[9]  *See, e.g., In re Sterling Mining Co.*, 2010 WL 6730632, at *4 (Bankr. D.Idaho)(Court held that the fact that objecting lien holders "could have had their liens, claims, or interests extinguished in a state foreclosure sale pursuant to applicable state law" satisfied one or more subsections of section 363(f)). *See Terra XXI, Ltd. v. Harmon*, 279 S.W.3d 781, (Tex. App. 2007) (Noting that Texas law includes the right to judicial and nonjudicial foreclosure. *See* TEX. PROP.CODE ANN. § 51.002 (Vernon 1998); *see also Edmundson Inv. Co. v. Fla. Treco, Inc.*, 633 S.W.2d 599, 601–02 (Tex.App.-Houston [14th Dist.] 1982, writ ref'd n.r.e.))

---

**D.      ADEQUATE PROTECTION**

23.      As part of the Proposed Sale free and clear of liens, claims, interests, and encumbrances, the Debtors are generally required to provide adequate protection to the holder of any interest in the Sale Property. *See* 11 U.S.C. § 363(e). Here, all liens in and to the Sale Property will attach to the Proceeds with the same validity, extent, and priority that otherwise exists. Title and possession of the Sale Property will not be released to the Proposed Buyer until GOG receives payment in full under the terms of the Sale Agreement, and all Proceeds will be deposited into GOG's DIP account. Further, all of the net sale proceeds from the Proposed Sale will be held for distribution until as ordered by the Court. Finally, BB&T and the Judgment Creditors will continue to be secured by the remaining portion of the Property which, per the recent appraisal, has over $23 million of equity in excess of their asserted liens even after the Proposed Sale. The Debtors submit that these facts and protections provide adequate protection to any creditor with an interest in the Sale Property.

**E.      PAYMENTS FROM PROCEEDS**

24.      Although all liens, claims, interests, and encumbrances will attach to the Proceeds with the same validity, extent and priority as otherwise exists, GOG requests immediate authority to distribute some of the Proceeds upon closing of the Sale Property.

25.      First, GOG requests authority to pay the six percent (6%) brokerage commission to PRI. The Debtors have filed an application to retain PRI simultaneously with the filing of this Motion. However, there should be no question that PRI is entitled to its commission, since it brokered the Proposed Sale, and any failure to honor the same jeopardizes the Proposed Sale under nonbankruptcy law, jeopardizes potential future sales if it is believed that brokers might not get paid,

and subjects the Debtors' estates to an administrative expense claim for the full amount of the commission anyway.

26.     Second, GOG requests authority to pay any property taxes applicable to the Sale Property.

27.     Third, the Debtors request authority to pay ordinary and customary closing costs, pursuant to the Sale Agreement and applicable law.  Although the same have yet to be calculated, the Debtors do not believe them material.

28.     GOG will seek authority to disburse the remaining funds to BB&T, the Judgment Creditors and/or other parties after closing of the sale either on motion or in accordance with the terms of a confirmed plan of reorganization or further order of this Court.

## IV. <u>CONCLUSION</u>

WHEREFORE, PREMISES CONSIDERED, GOG respectfully requests the Court enter an order (i) granting this Motion (ii) authorizing GOG to sell the Sale Property to the Proposed Buyer under the terms of the Sale Agreement free and clear of all liens, claims, interests, and encumbrances; (iii) ordering that all such liens, claims, interests, and encumbrances attach to the Proceeds with the same validity, extent and priority as otherwise exists; (iv) authorizing GOG to make the distributions requested herein, including to PRI as real estate broker; (v) authorizing the Debtors to execute necessary, customary and appropriate closing and title documents; and (vi) granting GOG such other and further relief to which they may show themselves to be justly entitled.

DATED: June 8, 2011     Respectfully submitted,

        **WRIGHT GINSBERG BRUSILOW P.C.**

        By: */s/ Frank J. Wright*
           Frank J. Wright
           Texas Bar No. 22028800
           C. Ashley Ellis
           Texas Bar No. 00794824
           Gogi Malik
           Texas Bar No. 00787954

        14755 Preston Road
        Suite 600
        Dallas, Texas 75254
        (972) 788-1600
        (972) 239-0138 - fax

        **PROPOSED ATTORNEYS FOR DEBTORS**

## CERTIFICATE OF SERVICE

   I, the undersigned, hereby certify that on the 8th day of June, 2011, the above document was served via the ECF system of the Bankruptcy Court, facsimile, electronic mail, overnight courier, and/or first class United States mail, postage prepaid on each of the parties listed on the attached service list.

         *C. Ashley Ellis*
         C. Ashley Ellis

I:\9800s\9858\001\Pleadings\Sale Motion(v2).wpd

**In re The Gardens of Grapevine Development, L.P.**
**Case No. 11-43260-DML**

Altus Group
930 W. 1st St.
Suite 303
Fort Worth, TX  76180

Amegy Bank, N.A.
Attn:  Bill Palko, Vice Pres.
4400 Post Oak Pkwy.
Houston, TX  77027

Argus Software
3050 Post Oak Blvd.
Suite 900
Houston, TX  77056

Attorney General of Texas
Taxation Division - Bankruptcy
P.O. Box 12548
Capitol Station
Austin, TX  78711

BB&T/Colonial Bank
Attn:  Peter J. Nugent
BB&T Acquired Assets Group
8144 Walnut Hill Lane, #180
Dallas, TX  75231

BBVA/Compass Bank
Attn:  Bill Rosenberg
8080 N. Central Expressway
Suite 320
Dallas, TX  75206

City of Grapevine
P.O. Box 95104
Grapevine, TX  76099

Condon Thornton Harrell Malik LLP
8080 Park Lane
Suite 700
Dallas, TX  75231

D. Alan Bowlby & Associates, Inc.
P.O. Box 1067
Addison, TX  75001

Dallas County Tax Office
Attn:  John R. Ames, CTA
Tax Assessor/Collector
500 Elm St.
Dallas, TX  75202

Goodwin & Marshall, Inc.
2405 Mustang Drive
Grapevine, TX  76051

Grapevine-Colleyville ISD
3051 Ira E. Woods Ave.
Grapevine, TX  76051

Grapevine-Colleyville Tax Office
3072 Mustang Drive
Grapevine, TX  76051

GSBS Architects
7291 Glenview Dr.
Fort Worth, TX  76180

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA  19101

IRS - Special Procedures
Mail Code DAL-5020
1100 Commerce St.
Dalals, TX  75242

iTeres Group
P.O. Box 77177
Fort Worth, TX  76177

John Peter Smith Hospital
1500 S. Main St.
Fort Worth, TX  76104

K&L Gates LLP
210 Sixth Avenue
Pittsburgh, PA  15222

Larson, Allen, Weishair & Co., LLP
220 S. 6th St., Suite 300
Minneapolis, MN  55402

Liechty & McGinnis, LLP
Attn:  Kristy S. Bowen
11910 Greenville Ave.
Suite 400
Dallas, TX  75243

Loy and Shideh Lowary
6923 Preston Glen Dr.
Dallas, TX  75230

Morris Architects
1001 Fannin
Suite 300
Houston, TX  77002

Office of the U.S. Attorney
1100 Commerce St., 3rd Floor
Dallas, TX  75242

Pavlik & Associates
6115 Camp Bowie Blvd.
Suite 270
Fort Worth, TX  76116

Rafael Palmeiro
5216 Reims Court
Colleyville, TX  76034

Securities and Exchange Comm.
Corporate Regulation Division
450 Fifth Street
Washington, DC  20549

SettlePou
Attn:  David M. O'Dens
3333 Lee Parkway, 8th Floor
Dallas, TX  75219

State Comptroller of Public
Accts. - Revenue Accounting
Division - Bankruptcy Section
P.O. Box 13528
Austin, TX  78711

Strasburger & Price, LLP
Attn:  Elmer Murphey, III
2801 Network Blvd., Suite 600
Frisco, TX  75034

Stromberg Stock
Attn:  Aric L. Stock
5420 LBJ Freeway
Suite 300
Dallas, TX  75240

Tarrant County College District
1500 Houston St.
Fort Worth, TX  76102

Tarrant County Tax Assessor
100 E. Weatherford St.
Ft. Worth, TX  76196

Texas Workforce Commission
TEC Building - Bankruptcy
101 East 15th St.
Austin, TX  78778

Thomas Cinclair & Beuttenmuller, P.C.
Attn: Richard J. Cinclair, Jr.
5335 Spring Valley Road
Dallas, TX  75254

Town of Flower Mound
2121 Cross Timbers Road
Flower Mound, TX  75028

United States Trustee
Room 976
1100 Commerce St.
Dallas, TX  75242

City of Grapevine, Grapevine-Colleyville ISD
c/o Elizabeth Banda Calvo
Perdue, Brandon, Fielder
P.O. Box 13430
Arlington, TX  76094

Phi Engineering, Design & Consulting Corp.
Attn: Walter D. Gameiro
5412 Boat Club Road
Ft. Worth, TX 76135

## CONTRACT OF SALE

This Contract of Sale is made and entered into by and between Seller (as hereinafter defined) and Purchaser (as hereinafter defined).

## ARTICLE I
## DEFINED TERMS

1.1    As used herein, the following terms shall have the meanings respectively indicated:

(a)    "Access Easement Agreement" means that certain Access Easement Agreement, in favor of Seller, agreed upon by and between the Seller and Purchaser prior to the end of the Inspection Period, the size and location of which shall be identified therein for pedestrian and vehicular ingress and egress to the Second Phase Tract (the "Access Easement Area"), preserving the pad sites east of the Property and the Access Easement Area.

(b)    "Closing" means the consummation of the purchase of the Property by Purchaser from Seller in accordance with the terms and provisions hereof.

(c)    "Closing Date" means the date on which the Closing will be held.

(d)    "Contract" means this Contract of Sale by and between Seller and Purchaser.

(e)    "Contract Date" means the date upon which this contract has been signed by all parties hereto.

(f)    "Earnest Money Deposit" means that portion of the Purchase Price deposited by Purchaser in escrow with the Title Company at the times and in the form and amounts specified in Section 3.2.

(g)    "Environmental Laws" means any federal, state or local law, statute, ordinance, or regulation pertaining to health, industrial hygiene or the environmental conditions on, under or about the Property, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. Sections 9601 *et seq.*, and the Resource Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. Sections 6901 *et seq.*

CONTRACT OF SALE                                                Page 1

918528

EXHIBIT

"A"

(h)     "Option Agreement" means that certain Option Agreement, the form and substance of which is to be agreed upon by and between the Seller and Purchaser prior to the end of the Inspection Period as referenced in Section 11.3 herein.

(i)     "Property" means the approximate 16.825 acres of land (plus the Access Easement Area) situated in the City of Grapevine, Tarrant County, Texas, more particularly described on Exhibit "A", to be attached hereto upon the receipt of the Survey, together with all and singular the rights pertaining to such land, including, without limitation, any right, title and interest of Seller in and to any and all adjacent streets, roads, alleys, rights-of-way, strips, gores, mineral rights, and water rights.

(j)     "Permitted Exceptions" means those exceptions or conditions which affect or may affect Seller's title to the Property to which Purchaser does not object in accordance with Section 4.4.

(k)     "Purchase Price" means the total consideration to be paid by Purchaser to Seller for the Purchase of the Property.

(l)     "Purchaser" means Lincoln Property Company Southwest, Inc. and/or its assigns.

(m)     "Regulation" means any regulation, decree, code, ordinance, rule, or law of any city, county, state, or federal government or governmental agency.

(n)     "Seller" means Gardens of Grapevine, LP.

(o)     "Survey" means the survey of the Property prepared by the Surveyor in accordance with the terms and provisions of Section 4.3.

(p)     "Surveyor" means a Registered Public Surveyor or a Registered Professional Engineer duly and currently licensed by the State of Texas, and approved by Purchaser and the Title Company.

(q)     "Title Binder" means the Owner's Title Policy Commitment issued by the Title Company on behalf of the Title Underwriter in accordance with terms and provisions of Section 4.1.

(r)     "Title Company" means Republic Title of Texas, 2626 Howell Street, 10th Floor, Dallas, TX 75204, Attn: David Shutee.

(s)     "Title Policy" means the Owner's Title Policy issued by the Title Company on behalf of the Title Underwriter in accordance with the terms and provisions of Section 4.2.

CONTRACT OF SALE                                                    Page 2

(t)   "Title Underwriter" means the title insurance entity insuring the title policy issued through the Title Company.

## ARTICLE II
## AGREEMENT OF PURCHASE AND SALE

Upon the terms and conditions hereinafter stated, Seller hereby sells and agrees to convey the Property to Purchaser, and Purchaser, in reliance upon the warranties and representations of the Seller herein contained, and subject to the conditions precedent herein contained, hereby buys and agrees to take the Property from Seller.

## ARTICLE III
## PURCHASE PRICE

3.1   Purchase Price. The Purchase Price to be paid to Seller for the Property shall be determined by multiplying the number of Net Square Feet (as hereinafter defined) comprising the Property by $9.50.

3.2   Earnest Money Deposit. Within three (3) business days after the Contract Date, Seller shall deliver to the Title Company an initial Earnest Money Deposit in the amount of $25,000.00 in cash. If Purchaser has not terminated the Contract prior to the expiration of the Inspection Period, defined in Section 5.1 herein, Purchaser shall deliver an additional Earnest Money Deposit of $50,000.00. Thereafter upon the receipt of the change in zoning required by Purchaser, as more fully described in Section 11.2 hereof, Purchaser shall deliver to the Title Company yet an additional Earnest Money Deposit of $100,000.00. As used herein the term Earnest Money Deposit shall mean the amount of Earnest Money on hand at the Title Company at any time and from time to time. The Title Company shall deposit the Earnest Money Deposit, as received, in an interest-bearing account with the interest thereon to be disposed of in the same manner as the principal. If the purchase and sale hereunder is consummated in accordance with the terms and provisions hereof, the Earnest Money Deposit shall be applied to the cash portion of the Purchase Price at the Closing. In all other events, the Earnest Money Deposit shall be disposed of by the Title Company as herein provided.

3.3   Non-Refundable Consideration. The sum of $100.00 shall be delivered to the Title Company upon the Contract Date and is independent consideration (the "Option Consideration") for the option on the part of Purchaser to terminate the contract during and as provided in the Inspection Period (as described in Section 5.1). Any other provision hereof notwithstanding, said Option Consideration shall be paid to Seller if this Contract is terminated by Purchaser pursuant to a permitted termination or otherwise, and shall be applied to the Purchase Price upon and in the event of Closing. Any reference to the Earnest Money Deposit in the context of being returned to Purchaser shall exclude the Option Consideration. Seller agrees

that the Option Consideration is substantial, and not merely nominal, and is adequate consideration for holding the Property available to Purchaser during the Inspection Period.

3.4    Payment of Purchase Price. The Purchase Price shall be payable to Seller through the Title Company in cash at Closing.

## ARTICLE IV
## TITLE AND SURVEY

4.1    Title Binder. Within five (5) business days (as defined in Section 12.16) after the delivery of the Survey, Seller, at its sole cost and expense, shall cause to be furnished to Purchaser a current Title Binder. The Title Binder shall set forth the state of title to the Property together with all exceptions or conditions to such title, including, but not limited to, all easements, restrictions, rights-of-way, covenants, reservations, and all other encumbrances or other matters affecting the Property which would appear in an owner's title policy, if issued. In addition, the Title Company shall deliver copies of any financing statements filed against the Property. The Title Binder shall contain the express commitment of the Title Company to issue the Title Policy to Purchaser in the amount of the Purchase Price insuring such title to the Property as is specified in the Title Binder, with the standard printed exceptions endorsed or deleted in accordance with Section 4.2. At such time as Seller causes the Title Binder to be furnished to Purchaser, Seller shall further cause to be furnished to Purchaser true, correct, and legible copies of all instruments referred to in the Title Binder as conditions or exceptions to title to the Property.

4.2    Title Policy. At the Closing, Seller, at its sole cost and expense, shall cause the Title Policy to be furnished to Purchaser. The Title Policy shall be issued in the amount of the Purchase Price and shall insure fee simple, indefeasible title to the Property in Purchaser. The Title Policy may contain the Permitted Exceptions, but shall contain no additional exceptions to title to the Property other than the standard exceptions contained in Schedule B of the Texas State Board of Insurance Form T-1; (a) with the standard exception as to restrictive covenants endorsed "None of Record," except for those, if any, approved by Purchaser as Permitted Exceptions, (b) with the standard area and boundary exception endorsed to except only to shortages in area (the extra premium for which shall be a charge to the Purchaser), (c) with the standard exception as to taxes limited to taxes for the current and subsequent years, and (d) with any exception as to rights of Parties in possession to be deleted.

4.3    Survey. Within ten (10) business days after the Contract Date, Seller, at its sole cost and expense, shall cause the Survey to be furnished to Purchaser. The Survey shall be a "Category I," "Class 1-A" Survey, be currently dated, and shall show the location on the Property of all improvements, fences, evidences of abandoned fences, lakes, ponds, creeks, streams, rivers, easements, roads, and rights-of-way and shall show the location on the Property, if any, of the 100-year flood plain; shall identify all easements and rights-of-way by reference to the recording information applicable to the documents creating such easements or rights-of-way which have been recorded with the County Clerk of the county in which the Property is located;

shall show any encroachments upon the Property; and shall show thereon a legal description of the boundaries of the Property by metes and bounds or other appropriate legal description. The Survey shall specify the number of gross square feet comprising the Property on the number of net square feet comprising the Property with the latter calculation being the number used to determine the Purchase Price for the Property. As used herein the term "Net Square Feet" is defined to mean the number of gross square feet comprising the Property less the number of square feet lying within the Property boundary lines of easements which, in the reasonable determination of Purchaser, adversely and materially affect the intended use of the Property and construction of multifamily units or supporting structures, rights of way including the Access Easement Area (excluding however any square footage which may be sought to be taken in any condemnation proceeding instituted prior to the Closing Date, subject to the provisions of Section 8.1), the 100-year flood plain and any permanent encroachments on the Property which are not susceptible of being removed by Seller prior to Closing. The Surveyor shall certify to the Purchaser and to the Title Company that the Survey was made on the ground of the Property; that the Survey is correct; that there are no visible discrepancies, conflicts, encroachments, overlapping of improvements, fences, evidence of abandoned fences, lakes, ponds, creeks, streams, rivers, easements, overlapping of easements, roads, or rights-of-way except as are shown on the Survey plat; that the Survey plat is a true, correct and accurate representation of the Property; and identifying the area, if any, of the Property is located within the 100-year flood plain as shown on currently available designation maps.

4.4   Review by Purchaser.  Purchaser shall have thirty (30) days after receipt of the last of the Title Binder, the documents referred to therein as conditions, exceptions, or reservations to title to the Property, and the Survey, to review such items and to deliver in writing such objections as Purchaser may have to anything contained or set forth in the Survey or in the documents referred to in the Title Binder. Any such items to which Purchaser does not object within such applicable review period shall be deemed to be Permitted Exceptions. Should the Binder or the Survey be updated and such update reflects material (in Purchaser's reasonable determination) change to either the Title Binder or the Survey, the Purchaser shall have an additional five (5) days after receipt of any such updated material to deliver in writing any objections Purchaser may have to anything added to the Survey and/or the Title Commitment.

4.5   Termination for Purchaser's Objections.  If exceptions to the title to the Property have been raised in the Title Binder other than the Permitted Exceptions or the standard printed exception (if the standard printed exceptions have been endorsed or deleted in accordance with Section 4.2); or, if the Survey has not been furnished to Purchaser in the form specified in Section 4.3, then, in such event, Purchaser shall so notify Seller in writing, setting forth the specific objections to the Title Commitment and/or Survey (the "Title Objections") in accordance with the terms of Section 4.4.  Seller may thereafter notify Purchaser in writing within five (5) business days (failing which Seller shall be deemed to have elected not to cure any of such objections) of any of the Title Objections. Seller shall have no obligation to expend any monies to cure any Title Objections. Upon receipt of such written notice from Seller,

CONTRACT OF SALE                                                    Page 5

918528

Purchaser shall have five (5) business days within which to either (a) terminate this Contract by written notice to Seller, whereupon the Earnest Money Deposit theretofore made by Purchaser shall be returned to Purchaser, and all parties shall have no further obligations or liabilities to each other, or (b) Purchaser shall be deemed to have accepted the condition of the Property and the state of the title and exceptions thereto shown on such Title Binder and Survey.

## ARTICLE V
## INSPECTION PERIOD

5.1    Purchaser shall have sixty (60) days (the "Inspection Period") from the date that Seller has notified Purchaser in writing that Seller has obtained the Lender Approval (as defined in Section 11.1 hereof) within which to conduct such inspection of the Property as Purchaser may deem advisable in order to determine that the Property is suitable in all respects to Purchaser.  If Purchaser has not notified Seller within said sixty (60) day period that Purchaser finds the Property to be satisfactory, it shall be presumed that Purchaser has found the Property to be unacceptable and this Contract shall automatically terminate, the Earnest Money Deposit shall immediately be released to Purchaser and neither party shall have any further obligation one to the other, and Purchaser's Option Consideration shall be released to Seller immediately.

## ARTICLE VI
## REPRESENTATIONS, WARRANTIES, COVENANTS,
## AND AGREEMENTS OF SELLER

6.1    Representations and Warranties of Seller.  For the purpose of inducing Purchaser to enter into this Contract and to consummate the sale and purchase of the Property in accordance therewith, Seller represents and warrants to Purchaser as to the following as of the date of this Contract and as of the Closing Date, except where specified reference is made to another date or dates, in which cases such date or dates will be applied hereunder:

(a)    Seller will have and will convey to Purchaser at the Closing Date good and indefeasible fee simple title to the Property, free and clear of all conditions, exceptions, or reservations except the Permitted Exceptions.

(b)    There are no adverse or other parties in possession of the Property, or of any part thereof, except Seller.  No party has been granted any license, lease, or other right relating to the use or possession of the Property, or any part thereof, except as may be shown on the Title Binder.

(c)    Seller has not received notice, written or otherwise, from any governmental or quasi-governmental agency requiring the correction of any condition with respect to the Property, or any part thereof, by reason of a violation of any Regulation or otherwise that has not been corrected or otherwise cured.  Seller has not received notice of, and has no other knowledge or information of, any pending or contemplated condemnation action with respect to the Property, or any part thereof.

CONTRACT OF SALE

(d)     To the knowledge of Seller, no fact or condition exists which would result in the termination of any current access from the Property to any presently existing highways and roads adjoining or situated on the Property, or to any existing sewer or other utility facilities servicing, adjoining, or situated on the Property.

(e)     Seller has not received notice of, and has no other knowledge of, any pending or contemplated change in any Regulation or private restriction applicable to the Property, of any pending or threatened judicial or administrative action, or any action pending or threatened by adjacent landowners, or other persons, or of any natural or artificial condition upon or affecting the Property or any part thereof any of which would result in any material adverse change in the condition of the Property.

(f)     Seller has not received, and has no other knowledge of, any notice from any insurance company or board of fire underwriters requesting the performance of any work or alteration with respect to the Property, or requiring an increase in the insurance rates applicable to the Property that has not been complied with.

(g)     All debts, liabilities and obligations of Seller arising from the ownership and operation of the Property have been paid as they became due, or otherwise will be paid at Closing.  Except for debts, liabilities and obligations for which provisions are herein made for proration or other adjustments at Closing, there will be no debts, liabilities or obligations of Seller with respect to the Property (whether known, unknown, accrued, absolute, contingent or of any other character) outstanding as of the Closing Date.

(h)     As of the Contract Date, there are no writs of attachment, writs of execution, or voluntary or involuntary proceedings in bankruptcy pending, or to the knowledge of Seller, threatened against Seller or the Property under debtor relief laws.

(i)     Seller has, or will have at Closing, the full right, power and authority to sell and convey the Property to Purchaser as provided in this Contract and to carry out Seller's obligations hereunder.  All requisite partnership or corporate action necessary to authorize Seller to enter into this Contract and perform its obligations hereunder will have been taken.  The joinder of no person or entity other than Seller will be necessary to convey the Property fully and completely to Purchaser on Closing.

(j)     Seller is not a "foreign person" or a "foreign corporation" as that term is defined in Section 1445 of the Internal Revenue Code of 1957, as amended, and any applicable regulations promulgated thereunder, and Purchaser is not obligated to withhold portions of the Purchase Price for the benefit of the Internal Revenue Service.

Seller makes no representation or warranty as to the truth, accuracy or completeness of the information provided or made available by or on behalf of Seller to Purchaser in connection with

CONTRACT OF SALE                                              Page 7

918528

this Contract.  Purchaser acknowledges and agrees that all information is provided or made available to Purchaser as a convenience only and that any reliance on or use of such information shall be at the sole risk of Purchaser.  Seller will also provide Purchaser with a copy of any Environmental Site Assessment (the "Environmental Report") in Seller's possession, with regard to the Property.  By providing this Environmental Report to Purchaser, Seller (or any of its other related entities) is not making any representations or warranties, implied or otherwise, as to the accuracy of the factual information provided or the conclusions formed by the consultants who prepared the Environmental Report.  Further, Seller nor any of its related entities are making any representations or warranties as to the skill and care taken by the consultant in preparing this Environmental Report.  Seller and its related entities will not be responsible for conditions or consequences arising from relevant facts that were concealed, withheld, or not fully disclosed by the consultant, any regulatory or governmental agency, or from persons interviewed as part of the preparation of this Environmental Report.  Purchaser also acknowledges that the facts and conditions referenced in the Environmental Report may change over time and the conclusions and recommendations set forth herein are applicable only to the facts and conditions as described in the Environmental Report.  Purchaser should use good faith efforts in determining whether the Environmental Report is accurate.  Time and care should be taken to check whatever records are available to determine the environmental integrity of the Property and the accuracy of the Environmental Report.  Further, Purchaser should also note that the Environmental Report may have been prepared only for the benefit of Seller or its related entities, and thus the consultant firm who prepared the Environmental Report may have limited use of this Environmental Report only to Seller.

Seller agrees that Purchaser shall have until the expiration of the Inspection Period in which to make all inspections, studies or investigations desired by Purchaser with respect to the Property set forth above.  Purchaser and its authorized agents, employees or representatives shall be entitled to enter upon the Property at all reasonable times prior to the expiration of the Inspection Period upon reasonable prior notice to Seller and, at the option of Seller, while accompanied by Seller or its authorized agent or representative.  Purchaser shall not interfere with the business of Seller with regard to the Property, and Purchaser shall restore the Property to as near the same condition as it existed immediately prior to the conducting of any such inspection, study or investigation as is reasonably practicable immediately upon completion of each such inspection, study or investigation.  Purchaser shall not permit any liens or encumbrances to arise against the Property in connection with or as a result of such inspections, studies or investigations.  Purchaser shall indemnify, defend and hold Seller and the Property harmless of and from any and all losses, liabilities, costs, expenses (including, without limitation, reasonable attorneys' fees and costs of court), damages, liens, claims (including, without limitation, mechanics' or materialmen's liens or claims of liens), actions and causes of action arising from or relating to Purchaser's (or Purchaser's agents, employees or representatives) entering upon the Property to test, study, investigate or inspect the Property, whether pursuant to this Paragraph or otherwise, unless due primarily, in the reasonable determination of Purchaser, to the negligence or willful misconduct of Seller.

6.2     <u>Covenants and Agreements of Seller</u>.  Seller covenants and agrees with Purchaser as follows:

(a)     Within ten (10) days after the Contract Date, Seller, at Seller's sole cost and expense, will deliver to Purchaser the following:

(i)     True, correct, and complete copies of all of the most recent real estate and Personal Property tax statements with respect to the Property.

(ii)     True, correct and complete copies of all core, soil, and other like samples and tests taken with respect to the Property.

(iii)     Any architectural plans and specifications in Seller's possession or control.

(iv)     Any existing surveys of the Property.

(v)     Any existing environmental inspections of the Property.

(vi)     Any existing title policies relating to the Property.

(vii)     All current permits held with respect to the Property.

(viii)     All current contracts in any way relating to the ownership or operation of the Property.

(b)     Seller will, through and including the Closing Date, promptly advise Purchaser in writing of any changes, additions, or deletions, or modifications in or to any of the materials to be delivered to Purchaser pursuant to <u>Section 6.2(a)</u>, and will provide Purchaser with true, correct, and complete copies of such changes, additions, deletions, or modifications.

(c)     From the Contract Date until the Closing Date or earlier termination of this Contract, Seller shall permit Purchaser and Purchaser's agents and representatives, upon reasonable notice to Seller from Purchaser, enter upon and inspect the Property.

(d)     From the Contract Date until the Closing Date or earlier termination of this Contract, Seller shall:

(i)     Operate the Property in the manner in which it has heretofore been operated.

CONTRACT OF SALE                                                          Page 9

918528

(ii)    Not enter into any written or oral contract or other agreement that will not be fully performed by Seller on or before the Closing Date or that will not be cancellable by Purchaser without liability on or after the Closing Date.

(iii)    Advise Purchaser promptly of any litigation, arbitration, or administrative hearing before any governmental agency concerning or affecting the Property which is instituted or threatened after the date hereof.

(iv)    Not take, or omit to take, any action that would have the effect of violating any of the representations, warranties, covenants, and agreements of Seller contained in this Contract.

(v)    Not sell, assign, or convey any right, title, or interest whatsoever in or to the property, or create or permit to exist any lien, encumbrance, or charge thereon without discharging the same at the Closing Date.

## ARTICLE VII
## BROKERS

7.1    <u>Real Estate Commissions</u>.  By separate agreement Seller has agreed to cause to be paid a real estate brokerage commission to Sherwood Blount and Ralph Meyer of Parkway Realtors, Inc.

Except as set forth herein, each Party hereby represents and warrants to the other that it has not contracted or entered into any agreement with any real estate broker, agent, finder, or any other party in connection with this transaction, and it has not taken any action which would result in any real estate broker's, finder's, or other fees or commissions being due or payable to any party with respect to the transaction contemplated hereby.  Each party hereby indemnifies and agrees to hold the other party harmless from any loss, liability, damages, cost or expense (including reasonable attorneys' fees and costs) resulting to the other party by reason of a breach of the representation and warranty made by such party herein.  Notwithstanding anything to the contrary contained herein, the indemnities set forth in this <u>Article VII</u> shall survive the Closing.

7.2    <u>Broker's Advice</u>.  At the time of the execution of this Contract, the above-referenced Agents have advised and hereby advise Purchaser, by this writing, that Purchaser should have the abstract covering the real estate which is the subject of this Contract examined by an attorney of Purchaser's own selection or that Purchaser should be furnished with or obtain a policy of title insurance; and Purchaser hereby acknowledges that Purchaser has been so advised.

CONTRACT OF SALE                                                Page 10

## ARTICLE VIII
## CHANGE ON CONDITION

8.1    <u>Condemnation</u>.  If on or before the Closing Date, any portion of the Property has become condemned or sold under threat of condemnation, or becomes the subject of a condemnation proceeding, Seller shall promptly notify Purchaser and Purchaser shall, within ten (10) days after receipt of such notice, terminate this Contract by written notice to Seller, in which event Purchaser's Earnest Money Deposit shall be returned, or Purchaser shall be deemed to have elected to waive such condemnation, in which event at the Closing, Purchaser shall accept title to the Property subject to such condemnation, and Seller shall deliver all such condemnation proceeds to Purchaser, as and when received. No pending condemnation shall reduce the Purchase Price.

## ARTICLE IX
## CLOSING

9.1    <u>Date and Place of Closing</u>.  The Closing hereunder shall take place at 10:00 a.m., C.S.T., on the Closing Date in the offices of the Title Company.  The Closing Date shall be a date which is five (5) business days from the date Purchaser notifies Seller in writing that Purchaser is prepared to close the transaction contemplated herein but in no event later than sixty (60) days from the later to occur of (i) the expiration of the Inspection Period described in <u>Article V</u>, and (ii) the expiration of the Zoning Period as described in <u>Section 11.2</u> hereof.

9.2    <u>Postponement of Closing by Purchaser</u>.  If on the Closing Date, the Title Company has advised that it is not able to issue the Title Policy in accordance with <u>Section 4.2</u>, then at Purchaser's sole option, the Closing may be postponed for not more than fifteen (15) days and such postponed date shall then be the Closing Date.

9.3    <u>Items to be Delivered at the Closing</u>.

(a)    <u>Seller</u>.  At the Closing, Seller shall deliver to Purchaser, at Seller's sole cost and expense, each of the following items:

(i)    The Title Policy, in the form specified in <u>Section 4.2</u> (which may be delivered shortly after closing when the deed is recorded).

(ii)    A special warranty deed, in form acceptable to Purchaser and in form for recording, conveying good and indefeasible fee simple title to the Property to Purchaser, subject only to the Permitted Exceptions.

(iii)    All additional documents and instruments which Purchaser's counsel and Seller's counsel may mutually and reasonably determine (or which

CONTRACT OF SALE                                        Page 11

918528

Title Company may require) as necessary to the proper consummation of this transaction.

(iv)    An affidavit, in form acceptable to Purchaser, as to Seller's non-foreign status.

(v)    The executed Option Agreement, in a form acceptable to Purchaser and Seller.

(vi)    The executed Access Easement Agreement, in a form acceptable to Purchaser and Seller.

(b)    Purchaser.    At the Closing, Purchaser shall deliver to Seller the cash portion of the Purchase Price.

9.4    Adjustments at Closing.    Anything to the contrary contained herein notwithstanding, the provisions of this Section 9.4 shall survive the Closing. Ad valorem and similar taxes and assessments relating to the Property for the calendar year in which the Closing Date occurs shall be prorated between Seller and Purchaser as of the Closing Date, based upon the best available estimates of the amount of taxes that will be due and payable on the Property during the calendar year in which the Closing Date occurs, and Seller shall pay to Purchaser in cash at the Closing the Seller's pro rata portion of such taxes and assessments. As soon as the amount of taxes and assessments on the Property for such year is known, Seller and Purchaser shall readjust the amount of taxes and assessments to be paid by each party with the result that Seller shall pay for those taxes and assessments attributable to the period of time prior to the Closing Date (including any deficiency in the escrow amount set aside as "Additional Tax Liability" in Section 9.5 herein). Any special assessments actually due and owing applicable to the Property for improvements presently made or contemplated to benefit the Property shall be paid by Seller.

9.5    Tax Recapture. Anything to the contrary contained herein notwithstanding, the provisions of this Section 9.5 shall survive the Closing. Prior to Closing, the parties shall make a good-faith estimate of the anticipated ad valorem tax "recapture" or other tax liability (the "Additional Tax Liability") for the year in which the Closing occurs and for prior years resulting from change of ownership or use, if any. An amount equal to such approximated amount shall be escrowed with the Title Company at the Closing out of Seller's proceeds and if there is any Additional Tax Liability, it shall be paid from the escrow account as soon as ascertained (with any escrow excess being paid to Seller and any escrow deficiency being owed by Seller on demand).

9.6    Possession and Closing.    Possession of the Property shall be delivered to Purchaser by Seller at the Closing.

CONTRACT OF SALE

9.7    Costs of Closing.  Except as otherwise expressly provided herein, each party shall be responsible for paying at the Closing their normal costs and expenses in connection with the transaction contemplation by this Contract.

## ARTICLE X
## DEFAULTS AND REMEDIES

10.1    Seller's Defaults; Purchaser's Remedies.

(a)    Seller's Defaults.  Seller shall be deemed to be in default hereunder upon the occurrence of any one or more of the following events:

(i)    Any of Seller's warranties or representations set forth herein is or becomes untrue at any time on or before the Closing Date.

(ii)    Seller fails to meet, comply with, or perform any covenant, agreement, or obligation on its part required with the time limits and in the manner required in this Contract.

(b)    Purchaser's Remedies.  If Seller is deemed to be in default hereunder, Purchaser's remedies shall be limited to the following:

(i)    Terminate this Contract by written notice delivered to Seller within ten (10) days after the date Purchaser receives notice of such default and Purchaser shall be entitled to recover its third-party costs and expenses (including, without limitation, reasonable attorneys' fees) incurred in connection with the negotiation of this Contract and its due diligence investigations of the Property;

(ii)    Enforce specific performance of this Contract against Seller (and recover Purchaser's reasonable attorneys' fees and costs in connection with Purchaser's action for specific performance), in which event Purchaser shall be deemed to have accepted Seller's title to the Property; provided however, if the remedy of specific performance is not available as the result of Seller's actions, Purchaser shall have the right to sue for damages or any other remedy available in law or at equity.

(c)    Return of Earnest Money Deposit.  Upon the occurrence of any event deemed to be a default by Seller hereunder, the Earnest Money Deposit shall be forthwith returned to Purchaser by the Title Company on receipt of written notice from Purchaser that Seller has defaulted under this Contract, which written notice need not be accompanied by any other document or consent of any other party hereto. If the Earnest Money Deposit is to be returned to Purchaser in accordance with this Section 10.1(c), Seller shall promptly, on written request from Purchaser, execute and deliver such

CONTRACT OF SALE                                                                                    Page 13

918528

documents as may be required to cause the Title Company to return the Earnest Money Deposit to Purchaser.

10.2    Purchaser's Default; Seller's Remedies.

(a)    Purchaser's Default. Purchaser shall be deemed to be in default hereunder if Purchaser fails to meet, comply with or perform any covenant, agreement or obligation on its part required within the time limits and in the manner required in this Contract, or fails to deliver, at the Closing, any of the items specified in Section 9.3(b), for any reason other than a default by Seller hereunder or termination of this Contract prior to Closing.

(b)    Seller's Remedy. If Purchaser is deemed to be in default hereunder, Seller, as Seller's sole and exclusive remedy for such default (Seller hereby waives any and all other legal or equitable remedies, including not exclusively, damages and specific performance), shall be entitled to the Earnest Money Deposit previously deposited by Purchaser with the Title Company, which shall be forthwith delivered to Seller by the Title Company on receipt of written notice from Seller that Purchaser has defaulted under this Contract, which notice need not be accompanied by any other document or consent of any other party hereto, it being agreed between Purchaser and Seller that such sum shall be liquidated damages for a default of Purchaser hereunder because of the difficulty, inconvenience, and uncertainty of ascertaining actual damages for such default. If Seller is entitled to the Earnest Money Deposit in accordance with this Section 10.2(b), Purchaser agrees to deliver, on written request of Seller, such instructions as may be reasonably necessary to cause the Title Company to deliver the Earnest Money Deposit to Seller.

## ARTICLE XI
## SPECIAL CONDITONS

11.1    Lender Approval. The Property is part of the larger parcel which larger parcel is encumbered by a lien securing certain indebtedness which Seller has one or more Lenders (collectively, the "Lender"). In order that Seller can convey the Property to Purchaser free and clear of any liens, Seller will have to have the Lender's Approval.   Therefore, Seller will endeavor to obtain the Lender's Approval as expeditiously as practicable from and after the Contract Date and shall notify Purchaser in writing at such time as the Lender's Approval has been obtained. If the Lender's Approval has not been obtained on or before the expiration of thirty (30) days from the Contract Date, Purchaser shall thereafter have the right to terminate the Contract by giving written notice of termination in which event the Earnest Money Deposit shall be promptly refunded to the Purchaser and neither party shall have any further rights or obligations hereunder.

11.2    Change of Zoning. In addition to the other condition precedent to Purchaser's obligation to consummate the transaction which is the subject of this Contract, Purchaser's obligation to close shall be contingent upon a zoning change which, in the sole discretion of

Purchaser, will allow Purchaser to develop the Property in accordance with Purchaser's plan for development of not more than 340 multifamily apartment units. Purchaser will prepare an application for the appropriate zoning change for Seller's review and approval which approval will not be unreasonably withheld, conditioned or delayed and thereafter Purchaser, with Seller's cooperation (but at no expense to Seller) shall file the application with the appropriate authority and seek to have the Property rezoned. If the Purchaser has not been successful in obtaining, within one hundred twenty (120) days from the expiration of the Inspection Period (the "Zoning Period") a satisfactory commitment from the appropriate municipal authority that the requisite zoning is approved, either party may terminate the Contract by giving written notice to the other in which case the Earnest Money Deposit shall be refunded to Purchaser and neither party shall have any further rights or obligations hereunder except those which expressly survive the termination of the Contract. In the event that zoning acceptable to Purchaser is obtained and Purchaser is so notified by Seller in writing prior to the expiration of 120 days, the Zoning Period shall end as of the date such notice is received by Purchaser.

     11.3   Second Phase Option. Purchaser shall have the option for a period of twenty-four (24) months from Closing Date (the "Option Period") to purchase from Seller,  the approximately 17 acres that are adjacent to the Property (the "Second Phase Tract"). Upon exercise of the Option by Purchaser and throughout the Option Period, Purchaser and Seller shall cooperate in filing a  zoning application with respect to the Second Phase Tract seeking such property be zoned for similar multi-family purposes and uses as that of the Property.  The Purchase Price for the Second Phase Tract shall be $9.50 per Net Square Foot plus an amount equal to five (5) percent per annum from the time of Closing to the Closing Date of the Second Phase Tract (the "Option Price").  The time period for an "inspection period" within which Purchaser shall  have an ability to perform its due diligence, including but not limited to, obtaining a survey, title commitment and pursue the zoning application, shall be specifically set forth in the Option Agreement (as defined herein). If during the Option Period Seller receives an acceptable offer for all or a portion of the Second Phase Tract (the "Third Party Offer"), Seller shall so notify Purchaser in writing setting forth the terms and conditions of the Third Party Offer and Purchaser shall have fifteen (15) business days to exercise its option to purchase the portion of the Second Phase Tract covered by the Third Party Offer under the same time frame as the Third Party Offer and at the price which is equal to the Option Price.  If the Purchaser elects not to exercise the option and the third party offeror fails to close the transaction which is the subject of said Third Party Offer, Purchaser's option as set forth herein shall remain in effect. The parties will use bona fide efforts to agree upon a form and substance of option agreement containing the terms and conditions set forth herein, prior to the expiration of the Inspection Period (the "Option Agreement").  If the parties are unable to agree upon the form of Option Agreement to be executed and delivered at Closing, Purchaser shall have the right to waive this condition and proceed to Closing or terminate the Agreement and receive a return of Purchaser's Earnest Money Deposit.  Notwithstanding the foregoing, if Purchaser and Seller can not agree on the form and substance of the Option Agreement, or if Seller receives an acceptable third party offer and Purchaser does not exercise its option as set forth herein, Seller will agree to restrict the

CONTRACT OF SALE                                             Page 15

918528

Second Phase Tract from development of one or more multi-family projects for two (2) years after the Closing Date. A recordable memorandum referencing Purchaser's Option as described therein shall be delivered to Purchaser at Closing and recorded by the Title Company in the real property records of Tarrant County, Texas. If Purchaser is unable to obtain satisfactory multifamily zoning for the Phase Two Tract prior to the expiration of the Option Period, the Option Agreement shall immediately terminate at that time.

     11.4   Access Easement Agreement. The parties will use bona fide efforts to agree upon a permanent Access Easement Agreement containing the terms and conditions set forth herein, prior to the expiration of the Inspection Period, it being understood that if Purchaser acquires the Property, Seller will require an easement of mutual ingress and egress to the Phase Two Tract over and across the Access Easement Area. Purchaser shall use best efforts to obtain a subordination of its lender (if any) with respect to the mutual Access Easement. If the parties are unable to agree upon the form of Access Easement Agreement to be executed and delivered at Closing, Purchaser shall have the right to waive this condition and proceed to Closing or terminate the Agreement and receive a refund of the Earnest Money Deposit. The Access Easement Agreement, in favor of Seller, shall contain, among other things, an access easement over and across the Access Easement Area for the purpose of vehicular and pedestrian access, ingress and egress to the Second Phase Tract.

## ARTICLE XII
## MISCELLANEOUS

     12.1   References. All references to "Article," "Section," or "Sections" contained herein are, unless specifically indicated otherwise, references to Articles and Sections of this Contract.

     12.2   Exhibits. All references to "Exhibits" contained herein are references to Exhibits attached hereto, all of which are made a part hereof for all purposes.

     12.3   Captions. The captions, headings, and arrangements used in this Contract are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

     12.4   Number and Gender of Words. Whenever herein the singular number is used, the same shall include the plural where appropriate, and words of any gender shall include each other gender where appropriate.

     12.5   Notices. All notices and other communications provided for in this Agreement shall be given or made by telex, telegraph, telecopy, cable, or in writing and telexed, telecopied, telegraphed, cabled, mailed by certified mail return receipt requested, or delivered to the intended recipient at the address specified below or, as to any party at such other address as shall be designated by such party in a notice to the other party given in accordance with this Section. Except as otherwise provided in this Agreement, all such communications shall be deemed to

CONTRACT OF SALE                             Page 16

have been duly given when transmitted by telex or telecopy, subject to telephone confirmation of receipt, or delivered to the telegraph or cable office, subject to telephone confirmation of receipt, or when personally delivered or, in the case of a mailed notice, when duly deposited in the mails, in each case given or addressed as aforesaid.

|  |  |
|---|---|
| If to the Purchaser: | Lincoln Property Company Southwest, Inc. |
| | 2000 McKinney Ave., Suite 1000 |
| | Dallas, Texas  75201 |
| | Attn:  Jeff Courtwright, Kim McCormick |
| | Telephone No.:  214.740.3300 |
| | Fax No.:  214.740.3447 |
| | |
| Copies to: | T. McCullough Strother |
| | McGuire, Craddock & Strother, P.C. |
| | 2501 N. Harwood, Suite 1800 |
| | Dallas, Texas  75201 |
| | Telephone No.  214.954.6827 |
| | Fax No.:  214.954.6868 |
| | |
| If to the Seller: | Gardens of Grapevine, LP |
| | 5216 Reims Court |
| | Colleyville, TX 76034 |
| | Attn: Rafael Palmeiro |
| | |
| Copies to: | David E. Brusilow, Esq. |
| | Wright Ginsberg Brusilow P.C. |
| | 14755 Preston Road, Suite 600 |
| | Dallas, Texas 75254 |
| | Telephone No. 972.788.1600 |
| | Fax No.: 972.702.0662 |

12.6    Governing Law.  This Contract is being executed and delivered, and is intended to be performed, in the State of Texas, and the laws of such State shall govern the validity, construction, enforcement, and interpretation of this Contract, unless otherwise specified herein.

12.7    Entirety and Amendments.  This Contract embodies the entire agreement between the parties and supersedes all prior agreements and understandings, if any, relating to the Property, and may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

CONTRACT OF SALE                                                          Page 17

918528

12.8    Survival of Representations and Warranties.  The representations and warranties set forth in this Contract shall survive the Closing and shall not be merged therein.

12.9    Multiple Counterparts.  This Contract may be executed in a number of identical counterparts.  If so executed, each of such counterparts is to be deemed an original for all purposes, and all such counterparts shall, collectively, constitute one agreement, but, in making proof of this Contract, it shall not be necessary to produce or account for more than one such counterpart. Facsimile signatures will be deemed originals for all purposes.

12.10    Parties Bound.  This Contract shall be binding upon and inure to the benefit of Seller and Purchaser, and their respective heirs, personal representatives, successors, and assigns. Purchaser may, prior to Closing, assign all its rights and obligations under this Contract to any person, firm, or corporation.

12.11    Risk of Loss.  Risk of loss or damage to the Property, or any part thereof, by fire or any other casualty from the date this Contract is fully executed up to the time of recording the general warranty deed transferring title to the Property to the Purchaser will be on the Seller and, thereafter, will be on the Purchaser.

12.12    Further Acts.  In addition to the acts and deeds recited herein and contemplated to be performed, executed, and/or delivered by Seller and Purchaser, Seller and Purchaser agree to perform execute, and/or deliver or cause to be Performed, executed, and/or delivered at the Closing or after the Closing any and all such further acts, deeds, and assurance as may be necessary to consummate the transactions contemplated hereby.

12.13    Fully Executed.  The date on which this Contract is fully executed (sometimes referred to herein as "the date hereof") shall for all purposes in this Contract be the date on which the Title Company acknowledges receipt of a copy of this Contract executed by Purchaser and Seller, with all changes to the typewritten portion of this Contract initialed by Purchaser and Seller.

12.14    Expiration.  The offer of Purchaser extended by the delivery of this Contract to Seller shall be automatically revoked unless Seller shall execute at least two (2) copies of this Contract and deliver one to Purchaser and one to the Title Company on or before 5:00 p.m., on the date which is three (3) business days after the date on which Purchaser has executed this Contract.

12.15    Time of the Essence.  It is expressly agreed by the parties hereto that time is of the essence with respect to this Contract.

12.16    Business Days.  All references to "business days" contained herein are references to normal working business days, i.e., Monday through Friday of each calendar week, exclusive of federal holidays.

CONTRACT OF SALE

12.17  <u>Attorney Fees</u>.  In the event of a dispute arising between the parties hereto, the successful party in any litigation shall be entitled to its reasonable attorneys' fees and costs in addition to all other sums due hereunder.

[Remainder of Page Intentionally Left Blank]

CONTRACT OF SALE

918528

PURCHASER:

**LINCOLN PROPERTY COMPANY
SOUTHWEST, INC.**

Date Executed by Purchaser:
_5-13-11_

By: _____
Name: Jeff Courtwright, Vice President

**SELLER:**

**THE GARDENS OF GRAPEVINE
DEVELOPMENT, L.P.,**
a Texas limited partnership

By:    The Gardens of Grapevine Development
GP, LLC,
a Texas limited liability company,
its sole General Partner

By: _____ MNG.
Rafael Palmeiro, Manager

Date Executed by Seller:
_5/13/11_

LIST OF EXHIBITS

Exhibit A    -    Property Description (to be attached upon receipt of the Survey)
Exhibit B    -    Earnest Money Deposit Agreement

CONTRACT OF SALE                                          Page 20

## EXHIBIT "A"

ATTACHED TO AND MADE A PART OF
CONTRACT OF SALE
BY AND BETWEEN
LINCOLN PROPERTY COMPANY SOUTHWEST, INC.
AND/OR ITS ASSIGNS, AS PURCHASER,
AND
GARDENS AT GRAPEVINE, LP, AS SELLER


Description of Property
[TO BE ATTACHED UPON RECEIPT OF SURVEY]

CONTRACT OF SALE                                      Page 21

918528

## EXHIBIT "B"

### RECEIPT OF EARNEST MONEY DEPOSIT
### AND AGREEMENT OF TITLE COMPANY

Republic Title of Texas (the "Title Company"), located at 2626 Howell St., Dallas, Texas 75204, hereby acknowledges the receipt of the following:

(i)     One (1) fully signed and executed copy of this Contract of Sale;

(ii)    The Option Consideration in the form of a check in the amount of $100; and

The Title Company hereby agrees to convert the Option Consideration check to cash and, when and if received, to hold the Earnest Money Deposit in an interest-earning account in escrow as escrow agent for the benefit of Seller and Purchaser and to dispose of the Earnest Money Deposit in strict accordance with the terms and provisions of this Contract of Sale.

TITLE COMPANY:              REPUBLIC TITLE OF TEXAS, INC.


                            By: _____
                            Name: _____
                            Title: _____

CONTRACT OF SALE                                        Page 22